UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

MOSHE BERLIN,

                    Plaintiff,                **MEMORANDUM & ORDER**
                                              18-CV-1545(EK)(LB)

          -against-

JETBLUE AIRWAYS CORP. et al.,

                    Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Plaintiff Moshe Berlin brought this action in 2018,
asserting twelve claims against JetBlue Airways, three of its
employees, and other unnamed defendants.  Berlin claims that he
was assaulted by members of the JetBlue staff on his flight from
Mexico City to Orlando, Florida.  The Honorable Margo Brodie (to
whom this case was previously assigned) dismissed all but one of
Berlin's claims at the Rule 12(b)(6) stage.  Defendants now move
for summary judgment on the remaining claim – that they are
liable for causing an "accident" under the Montreal Convention.
For the reasons set forth below, that motion is granted.

## I.   Background

          The following factual recitation is drawn from the
complaint; the evidentiary record, including deposition
testimony; and the uncontested evidence identified in the
parties' Local Rule 56.1 Statements of Undisputed Material

Facts.  The facts are viewed in the light most favorable to Berlin.

On March 22, 2016, Berlin took JetBlue Flight 1324 from Mexico City to Orlando.  Defs.' Local Rule 56.1 Statement ("Def. 56.1") ¶ 1, ECF No. 92.  While the flight was in the air, Berlin was involved in an altercation with members of the cabin crew.  *Id.* ¶¶ 2-11.  Law enforcement removed him from the aircraft when it landed in Orlando, and he was charged with interfering with a flight attendant.  *Id.* ¶¶ 21-23.  Berlin ultimately pleaded not guilty by reason of insanity.  *Id.* ¶¶ 28, 30.

## A.   The Events on Flight 1324

The parties tell markedly opposed stories about the events that transpired on Flight 1324.  Given the near-total absence of overlap between the two sides, I set out their explanations in turn.

### 1.   Berlin's Account

Berlin testified in his deposition that he felt "nervous" from the outset of the flight because his carry-on bag, which contained his medications (including Klonopin, which "relaxes" him when he travels), was placed in an overhead bin far from his seat.  Dep. Tr. of Moshe Berlin ("Berlin Dep.")

23:12-24:14, ECF No. 93-5.[1]  Berlin has also been prescribed lithium, which he was supposed to take twice a day, but he had not taken that medication for "approximately" the preceding ten days.  *Id.* at 24:25-25:12.  Berlin recalled the beginning of the flight as follows:

> I remember going into my seat, and putting on my seatbelt, and I was starting to feel my very, very bad chest pains[;] my chest was racing, I couldn't breathe, I was gasping for air, and reached out and tried to get somebody's attention for a drink, or to get some ice.

*Id.* at 26:12-20.  Though the complaint reports that Berlin "has an English Language Imperfection," Compl. ¶ 25, ECF No. 1, he apparently made himself understood: "I asked for some, for a drink, for ice, I remember somebody bringing me something to drink."  Berlin Dep. 28:17-19.  Despite this, Berlin continued "gasping for air" after takeoff.  *Id.* at 31:13-16.  He went to seek help: "I didn't feel good . . . .  I got up from my chair because I felt like I can't take it any more, I felt like I'm going to literally die if I don't get help.  So I walked to the back of the plane . . . ."  *Id.* at 31:14-18.

In the complaint, Berlin leveled a startling allegation about what happened next: crewmembers assaulted him because they mistook him for a terrorist.  Berlin's pleading

---

[1] Portions of Berlin's deposition cited in this Order are also located at ECF Nos. 96-8 and 97-34.

alleges that "[u]pon locating an agent in the aisle, [Berlin] made a second request for 'ICES' pointing to his throat," Compl. ¶ 39, following which an (unnamed) individual "alerted other agents" in the crew "that Mr. Berlin is saying 'ISIS'" — *i.e.*, referring to the jihadist organization. *Id.* ¶ 41. In response, he says, he was brutally assaulted.[2] *Id.* ¶¶ 42–43.

In contrast to the complaint, however, Berlin's deposition is devoid of any suggestion that crewmembers understood him to be invoking the Islamic State. Instead, he testified that as he walked in the aisle, he "asked for oxygen" because he couldn't breathe and thought he was "having a heart attack"; then "the next thing I know" is that "I fell on the floor, I collapsed on the floor or something." Berlin Dep. 32:4-9; *see also id*. 32:10-11 (collapsing on the floor was "the next . . . thing that I remember after asking for oxygen").

The next thing that Berlin recalled, after collapsing, was the alleged assault: "all of a sudden I remember myself in the back of the plane," where he "kept on screaming I need oxygen, I can't breathe, and all of a sudden I feel like somebody is grabbing me and punching me and hurting me." *Id.* at 32:21-33:2. A crew member whose "name tag was Kevin" "punched

---

[2] The complaint alleges that the crew began "beating him, giving him multiple punches (about 15 to 20 punches) to his face damaging his left eye and mouth breaking Plaintiff's Teeth." *Id.* ¶ 43. He alleges that one attendant made anti-semitic remarks. *Id.* ¶¶ 43, 45.

me and he kept on pushing my head towards, down towards the floor, and punching me on my face many times." *Id.* at 33:9-12. Berlin described suffering serious injuries: his eye was swollen," and three of his teeth were "knocked out." *Id.* at 33:12-16, 39:9-16.  He later required eye surgery, and he testified that "I think it is definitely from this injury" received during the in-flight altercation. *Id.* 33:16-18. Berlin also testified that he suffers from post-traumatic stress disorder as a result of the altercation. *Id.* 219:17-220:11.

Berlin has acknowledged, however, that his memory of the events in question is not complete.  He testified that he was "manic" and "not feeling well" at the time of the incident. *Id.* at 38:5-10.  Berlin admitted that "a lot of things I forget, a lot of things that happens to me during the episode it could be that I forgot." *Id.* at 18:14-25.[3]

In a later-filed declaration, Berlin recited the events a third time.  Decl. of Moshe Berlin ("Berlin Decl.") ¶¶ 1-18, ECF No. 97-2.  As in his deposition, he omitted any reference to the crewmembers hearing the name ISIS.  In contrast

---

[3] Berlin has bipolar disorder.  Def. 56.1 ¶¶ 12-17.  After the incident in question, Berlin told a forensic psychologist that prior to boarding Flight 1324, he had slept for no more than a few hours (total) over a four-day period.  Forensic Evaluation 6, ECF No. 93-15.  While in Mexico, he had also went to night clubs and had used marijuana.  *Id.*  Although he told the psychologist that his medication was stolen approximately two weeks before he went to Mexico, authorities found several prescription medications in his suitcase, including clonazepam, benzotropine, and Latuda, as well as the lithium that he had not taken for ten days.  *Id.*

to his deposition, however, he spoke of blacking out twice rather than once.  *Id.* ¶¶ 7, 9.  As during his deposition, he stated that the first time he passed out, he was still at his seat.  *Id.* ¶ 3–7.  When he awoke, he was "at the rear of the aircraft" with Daly, who "was seated by [his] side with a cup of ice [Berlin] apparently had requested at some point in between consciousness."  *Id.* ¶ 8.  He then blacked out again, and when he awoke, he was restrained, with his "hands and feet tied together."  *Id.* ¶ 10.  He admits that he "d[id] not remember what happened between the time I blacked out with [Flight Attendant] Daly by my side" and the time he "regained consciousness in the rear of the aircraft."  *Id.* ¶ 9.

  2.  <u>Defendants' Account</u>

   The Defendants' account of the altercation differed significantly.  The three JetBlue flight attendants who interacted with Berlin filed incident reports after the flight, as required by JetBlue policy, JetBlue University — Customer Compliance 23–24, ECF No. 100-3; all reported that Berlin became violent without provocation.  Kevin Flanagan recounted that Berlin fell to the floor, stood up quickly, charged at him, swore at him, and shouted "allahu akbar" and "death to America." Flanagan Incident Report, ECF No. 93-1.  Berlin then grabbed the handle to one of the aircraft doors and kicked at it while Flanagan attempted to subdue him.  *Id.*  At some point, Flanagan

reported, Berlin "stated he had a bomb in his bag and it will go boom!"  *Id.*

The other flight attendants' recollections were consistent with Flanagan's in important respects.  Philemon Eubanks described Berlin as collapsing in the aisle and then, and as he regained consciousness, "shoving and resisting our help, still yelling for oxygen and asking for air.  [S]till resisting and now wrestling with [K]evin [Flanagan]."  Eubanks Incident Report, ECF No. 93-2.  Mary Daly described the events similarly: "He was banging and pulling and head butting the double jump seat, aircraft right."  Daly Incident Report, ECF No. 93-3.  She went on: "He was using his legs and his fists and was very hard to restrain and he kicked me."  *Id.*

Eventually, with the help of several passengers, the flight attendants were able to control Berlin.  *See* Flanagan Incident Report; Daly Incident Report.  The flight attendants restrained him with their airline-issued handcuffs and supplemented those with seatbelt extensions.  Flanagan Incident Report.  "During this entire time," Flanagan reported, Berlin "continued ranting and tried to break free."  *Id.*  As a result, Daly indicated, four people (two passengers, as well as Flanagan and Eubanks) had to remain with Berlin, who "continu[ed] to be combative and cry[] out ISIS."  Daly Incident Report.

To ensure the security of the aircraft, two JetBlue pilots sitting in the cabin were asked to guard the door to the flight deck for the remainder of the flight. *Id.* The rear galley and lavatories were closed, and passengers were allowed to use the front lavatory one at a time. *Id.*

**B.   The Aftermath of the Flight**

Law enforcement and emergency medical services met the plane upon landing and escorted Berlin from the flight. Out of Hospital Care Report 3, ECF No. 93-7.[4] Berlin initially declined treatment. Refusal of Medical Care / Transport Checklist, ECF No. 93-6. The EMTs noted: "PT [patient] relates he has no medical complaints at this time." Out of Hospital Care Report 3.

Berlin later changed his mind and asked to be transported to Florida Hospital. Refusal of Medical Care / Transport Checklist. The hospital's records note mild pain, "no acute distress," and no dental injury; but they do note bruising on his knees, abrasions on his wrists, a possible lung injury, and a head abrasion / contusion. Florida Hospital Emergency Physician Record ("ER Record") 16-19, ECF No. 93-8. Those

---

[4] Excepting deposition transcripts, page numbers in citations to record documents refer to ECF pagination.

records also note that Berlin was exhibiting "grandiose"
thinking.   ER Record 17.

Berlin was indicted in the Middle District of Florida
for interfering with a flight attendant in violation of
49 U.S.C. § 46504.   Indictment, *United States v. Berlin*, No.
6:16-CR-67 (M.D. Fl. Apr. 13, 2016), ECF No. 14.   He ultimately
pleaded not guilty by reason of insanity and was released from
custody in February 2017.   Amended Order of Release, *United
States v. Berlin*, No. 6:16-CR-67 (M.D. Fl. Feb. 21, 2017), ECF
No. 69; *see also* Berlin Decl. ¶ 26 ("Although I felt I was
innocent of the charge, a plea of NGROI became a means to an end
that secured my release from federal confinement.").

## II.  Procedural History

Berlin initiated this action *pro se* on March 13, 2018,
naming JetBlue Airways Corporation and flight attendants Kevin
Flanagan, Mary Daly, and Philemon Eubanks.   *See* Compl. ¶ 1.
Berlin later retained counsel.   Notice of Appearance, ECF No.
18.   The complaint set out twelve causes of action.   Judge
Brodie dismissed all but the second cause of action — she held
that that claim could, if "[c]onstrued liberally," be
interpreted to allege an "accident" under article 17 of the
Montreal Convention.[5]   Minute Entry dated April 27, 2018.   Judge

---

[5] Convention for the Unification of Certain Rules for International
Carriage by Air, May 28, 1999, T.I.A.S. No. 13,038.

Brodie noted, and defendant also acknowledged, "that plaintiff's eleventh (psychological injuries) and twelfth (vicarious liability) causes of action . . . relat[e] to damages" and were not "independent causes of action."  *Id.*

Defendants now move for summary judgment.  They argue: (1) Berlin interfered with the crewmembers as a matter of law; (2) no "accident" transpired within the meaning of the Montreal Convention; and (3) JetBlue's compliance with its security program is an absolute defense to liability under the Tokyo Convention[6] and the Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (2001) (codified as amended in scattered sections of 5, 31, and 49 U.S.C.).  *See* Mem. in Supp. of Mtn. for Summ. J., ECF No. 94-17.

### III. Summary Judgment Standard

Summary judgment is appropriate if the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56.  "A fact is material for these purposes if it might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

---

[6] Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963, 20 U.S.T. 2941.

nonmoving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[7]

The moving party has the burden of demonstrating the absence of a question of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant carries its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). Thus, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). Testimony that is "wholly fanciful" cannot create an issue of fact. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

---

[7] Unless otherwise noted, when quoting caselaw this Order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

## IV.  Discussion

Berlin's remaining claim arises out of the Montreal Convention.  *See* Montreal Convention art. 1(1) (applying to "all international carriage of persons, baggage or cargo performed by aircraft for reward"); *cf. Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003) ("A passenger whose injuries fall within the scope of the Warsaw Convention is either entitled to recovery under the Convention or not at all.").[8]

To prevail, Berlin must point to evidence showing that his injuries were caused by an "accident" within the meaning of the Conventions.  See Montreal Convention art. 17(1) (an air carrier is liable for injuries sustained by passenger if "the accident which caused the . . . injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking").  In *Air France v. Saks*, 470 U.S. 392 (1985), the Supreme Court defined "accident" as "an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405.[9]  The definition is relatively broad; an assault by

---

[8] The Montreal Convention succeeded the Convention for the Unification of Certain Rules Relating to International Transportation by Air ("Warsaw Convention"), Oct. 12, 1929, 49 Stat. 3000.  The Second Circuit has held that "Montreal Convention provisions may be analyzed in accordance with case law arising from substantively similar provisions of . . . the Warsaw Convention."  *Cohen v. Am. Airlines, Inc.*, 13 F.4th 240, 245 (2d Cir. 2021).

[9] *Saks* and other cases decided before the ratification of the Montreal Convention interpreted "accident" as used in the Warsaw Convention.  *See* 470 U.S. at 396; *see also, e,g.*, *Olympic Airways v. Husain*, 540 U.S. at 649 & n.4

crewmembers, if proved, would (perhaps counterintuitively) be an accident under the treaty. *See Cohen v. Am. Airlines, Inc.*, 13 F.4th 240, 245 (2d Cir. 2021) (Montreal Convention covered passenger's claim that a flight attendant hit him while boarding a flight); *Glassman-Blanco v. Delta Airlines, Inc.*, No. 13-CV-4287, 2016 WL 5017468, at *4 (E.D.N.Y. Feb. 3, 2016) (same, for passenger's claim that a pilot punched him), *report and recommendation adopted*, 2016 WL 1171611 (E.D.N.Y. Mar. 25, 2016); *see also Matveychuk v. Deutsche Lufthansa, AG*, WL 08-CV-3108, 2010 WL 3540921, at *1–3 (E.D.N.Y. Sept. 7, 2010) (same, for passenger's claim that she was assaulted in an airport restroom by a gate agent during a layover); *cf. Olympic Airways v. Husain*, 540 U.S. 644, 656 (2004) (even unusual inaction by a flight crew is covered by the Warsaw Convention).

   To the extent Berlin's injuries resulted from his own health issues, however, they are not the product of an accident — even if the cabin crew responded negligently, as long as the response was not "unexpected and unusual." *Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F. Supp. 3d 436, 441–42 (E.D.N.Y. 2014), *aff'd,* 621 F. App'x 82 (2d Cir. 2015); *see, e.g.,* *Tandon v. United Air Lines*, 926 F. Supp. 366, 369–70

---

(2004).  The Second Circuit has suggested that it agrees with the (at least three) other Courts of Appeals that have applied *Sak*'s definition of "accident" under the Warsaw Convention to claims brought under the Montreal Convention.  *See Cohen*, 13 F.4th at 244–45.

(S.D.N.Y. 1996) (failure to provide adequate medical care to
heart attack victim "is not the type of external, unusual event"
that would constitute an accident).  Nor can Berlin recover to
the extent he was injured because his own actions required the
crew to restrain him.  *See Levy v. Am. Airlines*, No. 89-CV-7005,
1993 WL 205857, at *4 (S.D.N.Y. June 9, 1993) (summary judgment
was appropriate where "there is no dispute that [the
passenger's] injuries, if any, resulted from his own conduct or
the acts of the DEA agents" escorting him), *aff'd*, 22 F.3d 1092
(2d Cir. 1994); *cf. Cush v. BWI Int'l Airways Ltd.*, 175 F. Supp.
2d 483, 487-88 (E.D.N.Y. 2001) (no "accident" occurred where the
altercation at issue resulted from passenger's refusal to
deplane following orders from immigration authorities); *Grimes
v. Nw. Airlines, Inc.*, No. 98-CV-4794, 1999 WL 562244 (E.D. Pa.
July 30, 1999) (dismissing plaintiff's article 17 claim because
"[w]hatever injuries [the plaintiff] suffered occurred because
he was arrested, and he was arrested only because he refused to
leave the plane voluntarily"), *aff'd*, 216 F.3d 1076 (3d Cir.
2000) (unpublished table decision).

Berlin's complaint can be read two ways: to suggest
that he was assaulted without provocation, or to allege that the
flight crew employed excessive force to restrain him after he
had a medical episode.  The first of these possibilities is
simply too fanciful to devote much time to.  I consider both in

turn, devoting substantially more analysis to the latter
contention.

## A.   Unprovoked Assault

Berlin has adduced insufficient evidence that he was
assaulted without provocation to survive a motion for summary
judgment.  For starters, he has produced no corroboration
whatsoever for his own assertions, despite the fact that the
alleged assault occurred on an international flight carrying
over 140 passengers.  *See Lozada v. Delta Airlines, Inc.*, No.
13-CV-7388, 2014 WL 2738529, at *5 (S.D.N.Y. June 17, 2014)
(granting summary judgment to defendant in part because
plaintiff's claim that she was wrongfully removed from airplane
was supported only by her own deposition, which did "not present
controverting facts" and "merely consist[ed] of a few general
statements that she did not know what was happening").

And Berlin's own position has been contradictory, to
put it generously: for example, in the complaint, he recalled
being assaulted when crew members mistakenly understood him to
be invoking the name of a global terrorist organization, but he
abandoned that assertion entirely in his deposition testimony.
In his deposition testimony, he spoke of having "collapsed"
once, Berlin Dep. 32:3–11; in his subsequent declaration, he
reports having blacked out twice, including at the critical

moment (in the lead-in to the alleged assault).  Berlin Decl.
¶¶ 7–10.

      Critically, Berlin's post-deposition Declaration reads
like an expression of the *defense* position, in that he
acknowledges a total lack of recall surrounding the events
leading up to his restraint.  *See* Berlin Decl. ¶ 9 ("I . . . do
not remember what happened between the time I blacked out with
Daly by my side [and] when I regained consciousness in the rear
of the aircraft.").  And the record indicates that this is not
the only key moment at which he blacked out.  *Id.* ¶¶ 3–9 (Berlin
remembers "passing out" at his seat, "awakening at the rear of
the aircraft," then "blacking out again").  Given that Berlin's
position is predicated only on his own testimony, and his
testimony suffers from important gaps, contortions and
reversals, he cannot overcome summary judgment.  *See, e.g.*, *Aziz
Zarif Shabazz v. Pico*, 994 F. Supp. 460, 470 (S.D.N.Y. 1998).

**B.    Excessive Force Claim**

      As the Defendants point out, the Tokyo Convention
applies here as well.  That treaty allows crew members on
international flights to use "reasonable measures including
restraint" when necessary to ensure "the safety of the aircraft,
or of persons or property therein," or "to maintain good order
and discipline on board."  Tokyo Convention art. 6(1).  This
authorizes reasonable force.  Berlin argues, nevertheless, that

16

the force applied to restrain him went beyond what was

reasonably necessary — for example, that the crew members

> punched [me] in my head, several, lots of times,
> I don't know if it was 15 or 20 times but many,
> many times in my head, and kicked and getting
> punches and also the elbow of Kevin [Flanagan]
> was all the time he kept on elbowing me as hard
> as possible.

Berlin Dep. 198:15-20.

Even if Berlin's conduct warranted the crew members'

efforts to restrain him, he nevertheless may have been the

subject of an accident — and the crew may not have been

protected by the Tokyo Convention — if the force applied in

response exceeded the bounds of reasonableness.  *Compare Eid v.*

*Alaska Airlines, Inc.*, 621 F.3d 858, 868 (9th Cir. 2010)

("[A]irlines are immune from liability for conduct covered by

the Tokyo Convention only to the extent flight commanders act

reasonably in exercising the powers granted to them under the

treaty."), *with id.* at 879 (Otero, J., dissenting in part and

concurring in part) ("[T]he Tokyo Convention affords

considerable deference to the in-flight actions of the aircraft

commander.  In short, such actions are permitted unless

arbitrary or capricious.").  But even then, Berlin's claim would

founder on the same shoals discussed above — namely, the facts

that (a) he does not remember the events leading up to his

restraint, Berlin Decl. ¶ 9; and (b) he contradicted himself so

many times concerning the events that followed.  *See Rojas*, 660 F.3d at 106; *Rodriguez*, 830 F. App'x at 339.

Whether the restraints employed were unreasonable is, by the Tokyo Convention's definition, a function of the conduct in response to which those restraints were imposed.  Given that Berlin has failed meaningfully to contest the Defendants' evidence that he put his hand on the aircraft door handle, yelled various threats associated with terrorists, claimed to have a bomb, and behaved violently enough that it took four people, multiple pairs of handcuffs, and two seatbelt extensions to restrain him, he cannot establish unreasonable force.  To successfully oppose a properly supported summary judgment motion, the opposing party must present more than merely colorable evidence; it must be probative.  *See Anderson*, 477 U.S. at 250-51.  "Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful."  *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

Berlin has not done so.  On the contrary, his excessive-force claim must be dismissed because (1) it relies almost entirely on his own testimony, which is internally contradictory, simply incredible, and suffused with important gaps; (2) it is contradicted by the available medical evidence; and (3) this is a circumstance in which at least some

18

corroboration would (by definition) be available if the events
had transpired as Berlin relates them.  The first of these three
factors is the most important here.  I discuss all three in
turn.

    1.   <u>Contradictory and Incredible Testimony</u>

        Berlin's versions of the events are, taken as a whole,
simply incoherent.  To be sure, a plaintiff's own testimony may
be enough to survive summary judgment, even without substantial
corroboration; but not when the testimony is "simply
incredible," "contradictory and incomplete," or "so replete with
inconsistencies and improbabilities that no reasonable juror
could credit it."  *Adamson v. Miller*, 808 F. App'x 14, 16 (2d
Cir. 2020).  In *Jeffreys v. City of New York*, the Second Circuit
held that summary judgment may be awarded where there is
"nothing in the record to support plaintiff's allegations other
than plaintiff's own contradictory and incomplete testimony,"
and "even after drawing all inferences in a light most favorable
to the plaintiff," the court determines that "no reasonable
person could credit [the plaintiff's] testimony."  426 F.3d at
555.

        Berlin's various accounts are starkly inconsistent.
He relies almost exclusively on his recollection for his proof,
but his complaint, deposition testimony, and declaration all
tell different stories.  And he provides (perhaps unwittingly) a

potential explanation for these inconsistencies when he
acknowledges the gap in his memory at critical moments.  Berlin
Decl. ¶ 9; Berlin Dep. 32:9–24.  These flaws are fatal here.  "A
claimant may not create a triable issue of fact by saying one
thing in a complaint and something else in a deposition." *Leary
v. Livingston County*, 528 F.3d 438, 444 (6th Cir. 2008); *see
also, e.g.*, *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 470
(S.D.N.Y. 1998) (granting summary judgment against plaintiff
after concluding that "[f]rom the complaint, to plaintiff's
deposition, to his opposition papers to defendants' summary
judgment motion, plaintiff's allegations of the events at issue
are replete with inconsistent and contradictory statements");
*Rodriguez v. County of Nassau*, 830 F. App'x 335, 339 (2d Cir.
2020) (affirming summary judgment against plaintiff in light of
"[t]he unexplained contradiction between [her] first deposition
and her subsequent deposition testimony and affidavit").  Such
contradictions "transcend credibility concerns and go to the
heart of whether the party has raised *genuine* issues of material
fact to be decided by a jury." *Rojas v. Roman Catholic Diocese
of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011).

When faced with a such a discrepancy, the party
opposing summary judgment has the burden of explaining "any
apparent inconsistency." *Cleveland v. Pol'y Mgmt. Sys. Corp.*,
526 U.S. 795, 807 (1999); *see also DeSilvis v. Nat'l R.R.*

*Passenger Corp.*, 97 F. Supp. 2d 459, 463 (S.D.N.Y. 2000).
Berlin offers no explanation for the discrepancies.  Indeed, he
proceeds in his Memorandum in Opposition to argue the wholly
unsupported theory that the flight crew confused his request for
ice as him expressing support for ISIS.  *See* Pl.'s Mem. in Opp'n
12, ECF No. 97.

   Taken together, these contradictions are a basis for
dismissal.  As then-Judge Sotomayor wrote in *Shabazz*, "when the
facts alleged are so contradictory that doubt is cast upon their
plausibility, [the court may] pierce the veil of the complaint's
factual allegations . . . and dismiss the claim."  994 F. Supp.
at 470; *see also, e.g.*, *Juarbe v. Carnegie*, No. 15-CV-1485, 2018
WL 3121635, at *8 (N.D.N.Y. Feb. 16, 2018) (granting summary
judgment where, "given plaintiff's changing version of the
relevant events, his assault conviction, and particularly his
statement, shortly after the incident, to the effect he did not
remember what occurred, . . . the evidence supporting his claims
is too incredible to be believed by reasonable minds")*, report
and recommendation adopted*, 2018 WL 1441331 (N.D.N.Y. Mar. 22,
2018); *Schmidt v. Tremmel*, No. 93-CV-8588, 1995 WL 6250, at *3
(S.D.N.Y. Jan. 6, 1995) ("No reasonable person would undertake
the suspension of disbelief necessary to give credit to the
allegations made in [the plaintiff's *Bivens*] complaint or in her
subsequent missives to the court.").

21

Meanwhile, the parties that do have coherent recollections – namely, the Defendants and their witnesses – all stated that Berlin was the aggressor.  As described above, they each proffered statements indicating that Berlin collapsed, awoke, and became startlingly physically and verbally aggressive.  *See supra* Section I.A.2; *see also* Dep. Tr. of Joseph Cornelius ("Cornelius Dep.") 26:2-19, ECF No. 96-6 (non-flying pilot attests that Berlin was "yelling aggressively at the people around him" and was "[f]ighting" with his hands).  They also described the need for multiple individuals to restrain Berlin.  Cornelius Dep. 26:2-10.[10]

2. Contradictory Medical Evidence

Although credibility determinations are generally not appropriate on summary judgment, district courts may grant summary judgment where medical records undercut a plaintiff's testimony.  *Vega v. Rell*, 611 F. App'x 22, 25-26 (2d Cir. 2015) (affirming grant of summary judgment on excessive-force claim where "uncontroverted medical records undercut each" of

---

[10] In addition to the Montreal and Tokyo Conventions, Berlin's international flight was governed by the Aviation and Transportation Security Act (ATSA).  This statute potentially provides an alternative basis for immunizing the actions of the flight attendants.  *See* 49 U.S.C. § 44903(k) ("An individual shall not be liable for damages in any action brought in a Federal or State court arising out of the acts of the individual in attempting to thwart an act of criminal violence or piracy on an aircraft if that individual reasonably believed that such an act of criminal violence or piracy was occurring or was about to occur.").  However, because summary judgment is appropriate under the Conventions, the Court need not reach the issue whether ATSA bars Berlin from recovery here.

plaintiff's "counter-assertions of fact"); *Henry v. Brown*, 406 F. Supp. 3d 211, 214 (E.D.N.Y. 2016) (collecting cases).  This rule, too, supports the grant of summary judgment to Defendants.

The case of *Davis v. Klein*, No. 11-CV-4868, 2013 WL 5780475 (E.D.N.Y. Oct. 25, 2013), illustrates how medical records can overcome a plaintiff's testimony at summary judgment.  In *Davis,* the plaintiff claimed that police officers "threw him up against a wall and kicked and punched him repeatedly in the head, face and back."  *Id.* at *1.  The plaintiff received medical attention on the same night.  *Id.* The court reviewed the medical records from this treatment and concluded that they were "wholly inconsistent with and offer[ed] no support for the type of brutality that Davis allege[d]."  *Id.* Citing the Second Circuit's holding in *Jeffreys*, the court held:

> [T]he hospital records from the evening of Davis's arrest demonstrate that, at most, Davis had minor soreness in his wrist.  If officers had repeatedly punched plaintiff during the arrest and booking process, as he alleges, it is simply not believable that the hospital records would indicate that Davis had "no skin abrasions" and that his facial appearance was "normocephalic and atraumatic."  These medical records, bluntly, directly contradict the version of facts plaintiff gave in his complaint as well as in his deposition.

*Id.* at *4 (citing 426 F.3d at 552).

Here, the treatment records render Berlin's testimony incredible.  For instance, Berlin complained of broken teeth he asserted were kicked out during the flight.  Compl. ¶¶ 42, 176;

Berlin Dep. 39:9-16, 215:11-24.  This claim is nowhere corroborated by contemporaneous medical records.  Berlin was treated by Orlando EMTs, Florida Hospital East, and Maimonides in New York, and their records make no reference to dental injury or broken teeth.[11]  *See Levy*, 1993 WL 205857, at *11-12 (granting summary judgment on excessive-force claim alleged to have occurred on an international flight where medical records listed only minor injuries and none of the serious injuries plaintiff claimed to have suffered); *Bove v. City of New York,* No. 98-CV-8800, 1999 WL 595620, at *6 (S.D.N.Y. Aug. 6, 1999) (granting summary judgment where record contained no physicians' affidavits or hospital records "to substantiate that the plaintiff's current ailments exist, let alone that the alleged 'beating' by the NYPD was the proximate cause of these injuries").

In fact, the report completed by the EMTs immediately after Berlin was removed from the aircraft note that Berlin "had no medical complaints."  Out of Hospital Care Report 3.  Berlin related "no head, neck or back pain at this time" as well as "no chest pain, SOB, ABD Pain, nausea or vomiting."  *Id.*  The only injuries noted were "swelling above the left eye" and an

---

[11] Berlin's dentist did replace his crowns in February 2017, after Berlin had served eleven months in jail noted above.  *See* Dep. Tr. of Steven Weiss 23:4-24, 32:23-33:10, ECF No. 96-9.

"approx. 2cm abrasion on his right palm that is not actively bleeding." *Id.*

Consistent with the EMTs' report, the hospital's records note "no acute distress." ER Record 16. The section on the same page addressing dental injury noted no such problems. *Id.* Medical personnel noted ecchymosis (bruising) on both knees and abrasions to both wrists, *id.* at 17, as well as a head abrasion / contusion, *id.* at 19; this is consistent with the restraints imposed. But Berlin showed no signs of fractures or dislocations. *Id.* at 18. X-rays of the chest and a CT scan of the head were negative for fracture and acute trauma. *Id.* at 18–19. The record reveals some indication of a collapse in the lower lobe of the left lung, but any lung condition apparently was not severe enough to merit a mention in Berlin's discharge papers, or to make it apparent that immediate medical care was required. *Id.* at 31–36, 48. Berlin's injuries did not justify his admission to the hospital, Def. 56.1 ¶ 34, and he signed himself out of the ER the day of the incident and returned to New York the next day without further medical intervention. *See id.* ¶¶ 34–36. He offers no evidence of medical interventions following his release on March 23. These records fatally undermine Berlin's claims that the flight attendants applied excessive force.

3.  <u>Absence of Other Corroboration</u>

Nor does Berlin offer any meaningful corroboration for his various versions of events, despite the close presence of scores of potential witnesses.  Berlin says he was viciously assaulted — punched, elbowed and kicked, with his teeth knocked loose — in a confined space with at least 140 other passengers. *See* Flight 1324 Manifest, ECF Nos. 100-10 to -12. Notwithstanding that, he has produced no witness to corroborate any part of his recitation of assault.  Courts have considered this kind of absence in granting summary judgment.  For example, in *Muhammad v. New York City*, "[d]espite alleging in his complaint that he was beaten in front of the entire [prison] ward," the plaintiff failed to identify or proffer any witnesses to corroborate his claim.  No. 15-CV-5603, 2016 WL 4367970, at *3 (S.D.N.Y. Aug. 12, 2016).  The court concluded that by relying merely on his own conclusory statements without witness corroboration, the plaintiff had not "put forth enough evidence to create a genuine issue of material fact."  *Id.*; *see also Torres v. Carry*, 800 F. Supp. 2d 577, 584 (S.D.N.Y. 2011) ("Although Torres claims that numerous inmates and officers observed the incident, he has never introduced statements from any witness to corroborate his version of events or to positively identify Carey at the scene.").  In *Torres*, the plaintiff's failure to present an even "minimally consistent

26

account as to what happened" rendered his various accounts
unreliable.  800 F. Supp. 2d at 584.  Here, it is relevant to
the summary judgment analysis that Berlin has produced no
supporting testimony despite the context in which he alleges
that excessive force was applied.

*     *     *

For all these reasons, this case implicates the
Supreme Court's directive that "[w]hen opposing parties tell two
different stories, one of which is blatantly contradicted by the
record, so that no reasonable jury could believe it, a court
should not adopt that version of the facts for purposes of
ruling on a motion for summary judgment." *Scott v. Harris*, 550
U.S. 372, 380 (2007).  Here, it is actually four different
stories, three of which come from Berlin.  On this record, no
reasonable jury could conclude that that the cabin crew's
restraint of Berlin was an unexpected event or happening
external to Berlin.  Instead, the record demonstrates that the
restraints the crew imposed were the product of and warranted by
Berlin's aggressive behavior.  *See, e.g., Dogbe v. Delta Air
Lines, Inc.*, 969 F. Supp. 2d 261, 274 (E.D.N.Y. 2013)
("Plaintiff's forcible removal as the result of his refusal to

comply with Delta's order to disembark the airplane does not constitute an accident.").[12]

## V.  Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety.  The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and close this case.

SO ORDERED.


                                    /s/ Eric Komitee
                                   ERIC KOMITEE
                                   United States District Judge


Dated:      May 5, 2022
            Brooklyn, New York

---

[12] Berlin also argues that JetBlue's security and security-related training manuals proscribe Defendants' treatment of Berlin, but Berlin counsel is not a "covered person" and can only gain access to this information, which is Sensitive Security Information, by applying to TSA for such access and submitting to a background check.  *See* Defs.' Letter Dated June 26, 2018, ECF No. 29.  *See generally* 29 C.F.R. pt. 1520.  Berlin's counsel declined to obtain the credentials necessary to receive SSI.  Pl's Resp. to Defs.' Suppl. Mem. of Law 3-4, ECF No. 106.  Accordingly, that this information is necessarily incomplete does not reflect, on this record, any unreasonable conduct by Defendants, and Berlin has forfeited any argument that the full contents of these documents preclude summary judgment.